Filed 6/24/24  In re T.C. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re T.C.,<br><br>A Person Coming Under the Juvenile Court Law.<br><br>_____<br><br>SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>P.C.,<br><br>     Defendant and Appellant. | A169859<br><br>(Sonoma County<br>Super. Ct. No. DEP6464) |

Appellant P.C. (father) appeals from the juvenile court's order terminating his parental rights as to T.C., following a Welfare and Institutions Code section 366.26 hearing.[1]  Father contends that the court erred in finding that T.C. was generally adoptable and in not applying the beneficial relationship exception.  We disagree and affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

# I. BACKGROUND

### A. Detention/Jurisdiction/Disposition Proceedings

On October 12, 2021, the Sonoma County Human Services Department (Department) filed a juvenile dependency petition under section 300 on behalf of then five-year-old T.C. He "was found to be in filthy condition, with grease and dirt caked onto his person, and a significant odor, as well as ingrown toenails." The petition alleged that father failed to protect T.C. "from exposure to a chronic pattern of intimate partner violence against the child's other father," Thomas C., who was 80 years old at the time. As a result of father's behavior, T.C. was alleged to be "at substantial risk of suffering emotional damage."

The petition also alleged that father failed to provide T.C. with a safe or adequate living environment "due in part to [] father's mental health symptoms" and that T.C. "was kept 'hidden' in the family home, kept in garages and in cars despite the father owning multiple properties and renting them out." The petition further alleged that Thomas C. was unable to provide for T.C.'s basic needs due to his age and physical decline.

In its detention report, the Department explained that T.C. was born via an unnamed surrogate in Nepal and that father was T.C.'s biological father. T.C.'s birth certificate does not list his biological mother. Thomas C. was married to father at the time of T.C.'s birth and adopted T.C. in 2016. The report noted that "[t]he fathers have an on-going pattern of domestic violence, and mutual allegations regarding abuse and neglect of [T.C.]." The report further noted suspected sexual abuse of T.C. as well as hazardous living conditions which threatened T.C.'s health and safety. The social worker who interviewed father observed that he "exhibited paranoid and

2

bizarre thoughts in discussion, and struggled to provide a linear narrative and remain present and oriented in time and place."

At the detention hearing, the juvenile court issued a detention order that removed T.C. from father's and Thomas C.'s custody. The court also ordered DNA testing for father and a copy of T.C.'s birth certificate.

In its November 2, 2021 jurisdiction report, the Department recommended that the juvenile court sustain the petition and order a psychological evaluation of father pursuant to section 361.5, subdivision (b)(2). The Department expressed concern for T.C.'s safety, noting that father "has unaddressed mental health and/or substance abuse issues that cause him to have paranoid thoughts, act violently towards Thomas [C.], and engage in arguments with various others, often when caring for [T.C.]." On December 17, 2021, Thomas C. passed away.

At the March 18, 2022 jurisdiction hearing, the juvenile court found the allegations in the Department's petition to be true by a preponderance of the evidence and sustained the petition pursuant to section 300, subdivisions (b) and (c). The court offered reunification services to father and ordered that he complete two psychological evaluations. It also elevated father to presumed father status.

In its disposition report, the Department recommended that the juvenile court declare T.C. a dependent of the court, order reunification services, and set a six-month review hearing. It also recommended the appointment of a Court Appointed Special Advocate (CASA) for T.C. The Department noted that, pending the two court-ordered psychiatric evaluations, it would request termination of reunification services should father be found eligible for bypass under section 361.5, subdivision (b)(2).

The Department further noted that in September 2021, father was arrested for domestic violence and elder abuse.

At the April 6, 2022 disposition hearing, the juvenile court adopted the Department's recommended findings and declared T.C. a dependent of the court. The court also concluded that the Indian Child Welfare Act did not apply.

On June 23, 2022, father filed a section 388 petition, requesting that T.C. be returned to his care and custody or, in the alternative, that his visits with T.C. be in person instead of by Zoom. In support, father claimed that he had completed parenting classes and tested negative for all substances. Neither father nor his counsel appeared at the section 388 hearing. The juvenile court found no changed circumstances and denied the petition. On August 31, 2022, the court appointed a CASA for T.C.

B. Six-Month/12-Month/18-Month Status Reviews

On September 8, 2022, the Department submitted father's psychological evaluation from April 29, 2022. The evaluation concluded that father "qualifie[d] for a bypass of services in that he has shown an inability and unwillingness to improve the quality of his parenting." Among other things, the evaluation recommended that father be screened for dementia and obtain alcohol and/or substance abuse support, individual therapy, as well as "parenting skills training."

In its six-month status review report, the Department recommended that reunification services be discontinued. The Department was concerned that father would "continue to have significant mental health and/or substance abuse issues." T.C. was attending individual therapy, and his therapist reported that T.C. was "pooping in his pants during many of the visits with his father and on zoom calls." The therapist explained that this

4

could occur when children " 'are feeling bigger feelings that they are not expressing verbally' " such as anxiety or stress. The Department noted that father "has made some efforts to follow some of the elements in his case plan" and has attended parenting classes and the CPI Dad's Group. The Department also noted, however, that father refused to get a second psychological evaluation and that his psychological issues prevented him "from being capable of benefiting from services within the timelines of the Family Reunification Program."

T.C.'s resource parents submitted a caregiver information form which reported that T.C. was doing great and "thriving in every aspect of his life." He occasionally referred to them as " 'mom' " and " 'dad' " and called himself their son. The six-month review hearing was continued multiple times because father wished to substitute his attorney and because he contested the recommendations. In the interim, the Department filed a section 388 petition, requesting termination of father's reunification services and the setting of a section 366.26 hearing. The petition argued that father still refused to complete a second psychological evaluation and that T.C. was "thriving in the care of his resource parents."

At the January 19, 2023 combined six/12-month review hearing, the juvenile court did not find that father substantially complied with the case plan but granted father an additional six months of services. On March 6, 2023, the court granted the resource parents' request for de facto parent status.

In its 18-month status review report, the Department continued to recommend that father's reunification services be terminated and a section 366.26 hearing be set. The report stated that "when [T.C.] was with his father he missed a lot of school and was often exhausted, too tired to do any

5

work.  Since being in his foster home [T.C.] arrived on time and was prepared to learn," and "[t]he teacher reported that his mood improved so greatly that he was one of the most well-adjusted children in the class."  The CASA also reported that T.C. was "thriving in his resource home" and that he was "experiencing safety and stability" there.

Although father attended parenting classes, the report concluded that "he has not been able to demonstrate . . . that he has gained the insight needed to understand and reflect how to change his behavior to address the safety concerns in this case."  Further, though father's weekly supervised visits went well, T.C. was still going to the bathroom during every visit, which appeared to be "some sort of nervous response."  During one visit, father told T.C. that "he would be coming back home really soon and that he would be getting tons of presents."  This was after the social worker had asked father "to stop bringing presents to his visits for a few weeks."  T.C. told the social worker "that he would like to keep living with his foster parents because he felt safe there."  He also expressed that he would like to live with father, but when asked whether he felt safe with father, T.C. replied, " 'I don't know, I don't want to say anything bad about my dad.' "

At the contested 18-month review hearing, the juvenile court accepted the Department's reports into evidence and took judicial notice of its court file.  Father and the social worker both testified.  After closing arguments, the court adopted the Department's proposed findings and orders and set a section 366.26 hearing.

C.  Section 366.26 Hearing

The CASA and the Department both submitted reports before the section 366.26 hearing.  The CASA received feedback from T.C.'s teacher that the stability and support provided by his resource parents were "contributing

6

very positively to his current academic success and progress." The CASA recommended that T.C. remain in his current placement. The Department determined that T.C. was "likely to be adopted" and recommended termination of father's parental rights and adoption as T.C.'s permanent plan. The Department evaluated T.C. to be "in good general health" and "developmentally on track for his age." Mentally and emotionally, T.C. was "generally stable" but could appear "unfocused, distracted, or dysregulated on occasion, which may be related to anxiety and his trauma history."

With respect to whether T.C. would benefit from continuing his relationship with father, the Department observed that T.C. appeared "non-emotional about the relationship with his father" and "showed no concern . . . when told his visits with his father would be decreased." The Department concluded that father's actions, including "bribing [T.C.] with gifts" and his "lack of physical boundaries [] during visits[,] . . . do not speak to a positive or healthy relationship that benefits [T.C.]." It further concluded that termination of father's parental rights would not be detrimental to T.C. as he "has thrived in one stable placement" for the past two years. Meanwhile, father "failed to make substantial progress to ameliorate the issues that necessitated [T.C.]'s removal" and has been "unable or unwilling to view [T.C.]'s comfort or wishes as important or valuable."

The Department determined that T.C. was an adoptable child with "no known needs that cannot be met with available interventions." T.C. appeared "very comfortable with his caregivers and report[ed] he wants to remain in their care permanently." The resource parents in turn were "committed to providing [T.C.] a permanent home with them through adoption."

On November 9, 2023, the resource parents updated the juvenile court that T.C. was "doing great" and was thriving in school. The CASA similarly reported to the court that T.C. was "really thriving," has a lot of friends, and "has gained so much confidence" in the last two years.

On January 5, 2024, the juvenile court held the section 366.26 hearing. At the hearing, the court received the Department's section 366.26 report (366.26 report) into evidence and took judicial notice of its court file. The court also received into evidence a stack of photos from father, depicting moments father shared with T.C. before his removal.

Father testified about his visits with T.C. and how T.C. looked forward to seeing him. He further testified that it would be to T.C.'s benefit to have continued contact with him because he is a "great dad who knows the needs of his son" and because T.C. "trusts and looks up to and loves and wants his dad to be around." During closing arguments, the Department's counsel reiterated that T.C. did not have "a significant positive emotional attachment" to father and that father's testimony focused more on what was best for him rather than T.C. T.C.'s counsel joined the Department's argument and emphasized that T.C. was loving, affectionate, and "very adoptable." Father's counsel argued that T.C. should remain in foster care so his beneficial relationship with father could continue to grow.

At the conclusion of the hearing, the juvenile court stated that it believed T.C.'s "long-term safety, [and] security, lies in adoption" as outlined by the Department's findings. The court found by clear and convincing evidence that T.C. was likely to be adopted, terminated father's parental rights, and ordered adoption as T.C.'s permanent plan.

Father timely appealed.

## II. **DISCUSSION**

Father contends that the juvenile court erred in finding that T.C. was generally adoptable and that the beneficial relationship exception did not apply. We find no error.

A. Substantial Evidence Supports the Adoptability Finding

As a threshold matter, father concedes that he has forfeited any challenge based on specific defects in the Department's adoptability assessment. (See also *In re Mary C.* (2020) 48 Cal.App.5th 793, 801 ["While the parents may question whether substantial evidence supports the juvenile court's findings of adoptability, by failing to object in juvenile court they have forfeited any challenge to specific defects in the report, such as omission of required content or insufficient discussion of required topics"].) In any case, even if there were defects in the report, which would go to the weight of the evidence, we do not find any defect "sufficiently egregious" so as to "impair the basis of a court's decision to terminate parental rights." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.) As a result, we only consider whether there is sufficient evidence to support the adoptability finding and conclude that there is.

"Before terminating parental rights, the court must find by clear and convincing evidence that it is likely that the child will be adopted within a reasonable amount of time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1290.) A finding of adoptability is "a low threshold" and is reviewed for substantial evidence. (*Id.* at p. 1292.) Indeed, we "review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion." (*Ibid.*)

The issue of adoptability focuses on "whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to

9

adopt the minor.  [Citations.]  Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)  Moreover, "a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*."  (*Id.* at p. 1650.)

Substantial evidence supports the juvenile court's finding that T.C. was likely to be adopted within a reasonable amount of time.  At the time of the section 366.26 report, T.C. was seven years old and had been living with his resource parents for two years.  The social worker observed that T.C. was "in good general health," "developmentally on track for his age," and was not in need of any special education services at school.  The CASA described T.C. as "a happy, healthy, young boy" after spending a considerable amount of time with him.  The resource parents likewise described T.C. as " 'smart', 'sweet', and 'charming' " and were committed to adopting him.  This evidence is more than sufficient to establish T.C.'s adoptability.

Father nevertheless argues that the adoptability finding is not supported by substantial evidence.  He points to a section of the 366.26 report which stated that T.C. "can appear unfocused, distracted, or dysregulated on occasion, which may be related to anxiety and his trauma history."  According to the report, T.C. was also "reluctant to discuss his own feelings" and at times "demonstrate[d] a low self-concept, making negative comments about himself when he feels he has done something wrong."  T.C. attended weekly individual therapy to address these issues.  The report then concluded that T.C. had "no known needs that cannot be met with available interventions."

Contrary to father's argument based on T.C.'s various "behavioral issues," there is nothing to suggest that the juvenile court failed to consider these issues in determining T.C.'s adoptability. The court received the 366.26 report into evidence and took judicial notice of its file in this matter. More importantly, these behavioral issues do not negate the ample evidence of T.C.'s adoptability.[2] (*In re K.B., supra,* 173 Cal.App.4th at p. 1292 ["It is irrelevant that there may be evidence which would support a contrary conclusion"].)

B. <u>The Beneficial Relationship Exception Did Not Apply</u>

Father next contends that the juvenile court erred in not applying the beneficial relationship exception. We disagree.

Section 366.26, subdivision (c)(1) provides a number of exceptions under which "the parent may avoid termination of parental rights in certain circumstances defined by statute." (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).) The beneficial relationship exception is one of them. (§ 366.26, subd. (c)(1)(B)(i).) This exception is "limited in scope" and requires that the parent establish three elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the

---

[2] *In re Brian P.* (2002) 99 Cal.App.4th 616, a case father relies on, is easily distinguishable. There, the court of appeal found no substantial evidence to support the juvenile court's adoptability finding because there was no adoption assessment report and only conclusory statements that the minor was " 'found to be a proper subject for adoption' " and was "adoptable." (*Id.* at p. 624.) By contrast, T.C.'s young age, the glowing statements from the social worker and CASA about his demeanor, behavior, and ability to thrive, and the willingness of his resource parents to adopt him provide more than enough evidence to support the juvenile court's adoptability finding.

11

child." (*Caden C.,* at p. 631, italics omitted.)  It is the parent's burden to establish these elements by a preponderance of the evidence.  (*Id.* at p. 636.)

A finding that the beneficial relationship exception does not apply is reviewed under a hybrid standard.  "The first two elements involve factual determinations to which the substantial evidence standard of review applies. [Citation.]  The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion." (*In re G.H.* (2022) 84 Cal.App.5th 15, 26.)

### 1. *Father Failed to Establish the Second Element*

The Department concedes that father met the first element of regular visitation and contact but argues that there is substantial evidence to support the juvenile court's finding that he did not meet the second element. As to that element, the regular visits must have "continued or developed a significant, positive, emotional attachment from child to parent."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  A positive attachment is one that "is nurturing and provides the child with a sense of security and stability."  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)  It is also "one where the child views the parent as more than a mere friend or playmate and [whose] interactions with the parent were not ambivalent, detached, or indifferent."  (*Ibid.*)  In making this determination, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C., supra,* 11 Cal.5th at p. 632.)

We agree with the Department that there is substantial evidence that T.C. did not have a significant, positive emotional attachment to father. Father argues that his attachment with T.C. was "substantial and positive" as evidenced by the photos he submitted to the juvenile court and his testimony at the section 366.26 hearing.  Specifically, father testified that

T.C. looked forward to seeing him during their visits and that T.C. trusted him and could tell him anything. The testimony of father alone, however, is insufficient to establish the second element, as the inquiry focuses on *the child* and not the parent. (*Caden C., supra,* 11 Cal.5th at p. 632.)

Although father's initial visits with T.C. "went fairly well," father fails to address several negative aspects of those visits which indicated that T.C. did not feel secure or stable with father. For example, T.C. frequently used the bathroom during the visits even though he was offered bathroom breaks beforehand. This was observed as a potential "nervous response to the visits, or an attempt to escape or take a break from the visit." Moreover, T.C. "separate[d] easily from [father]" and "showed no concern or emotion" when told his visits with his father "would be decreased." T.C. also did not ask his resource parents about father. Further, in April 2023, T.C. and his resource parents had an unplanned encounter with father at a community event. After father asked T.C. for a hug, he pulled T.C. onto his lap and asked if T.C. wanted to come home with him. T.C. pulled away and retreated to his resource parents. This evidence is enough to support the juvenile court's finding that father did not meet the second element of the beneficial relationship exception.

2. *The Juvenile Court Did Not Abuse its Discretion as to the Third Element*

As to the third element—"whether 'the termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C., supra,* 11 Cal.5th at p. 633.) The court determines "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the

13

parent in the child's life." (*Ibid.*) The court must act in the child's best interest and "decide[] whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

We initially note that because we find that father did not establish the second element, we need not consider the third element. But even if we did, we find no abuse of discretion in the juvenile court's holding that the termination of father's parental rights would not be detrimental to T.C. Again, father relies primarily on his own testimony that T.C. needed him and that any instability T.C. endured in foster care would be outweighed by his contact with father. These assertions are belied by the record. Not only does father fail to show a significant, positive emotional attachment which would benefit T.C., he also fails to acknowledge the tremendous progress T.C. has made while living with his resource parents.

Both the social worker and the CASA observed that T.C. was thriving in his new home. He attended school regularly, played a variety of sports, and had a lot of friends. He "display[ed] comfort and affection" with his resource parents and asked to stay with them permanently. He reported feeling safe with them and said, " 'they take good care of me.' " By contrast, when asked whether he felt safe with father, T.C. responded, " 'I don't know, I don't want to say anything bad about my dad.' "

Given this evidence, the juvenile court did not err in terminating father's parental rights and finding that the beneficial relationship exception did not apply.[3]

_____

[3] Father contends that it is "difficult to analyze the juvenile court's rationale" because the court did not engage in a *Caden C.* analysis. Father cites to no authority and we are not aware of any which requires the juvenile court to "recite specific findings relative to its conclusions regarding any or all

## III.  DISPOSITION

The January 5, 2024 order terminating parental rights is affirmed.

---

of the three elements of the exception."  (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.)

                              CHOU, J.

We concur.


JACKSON, P. J.
BURNS, J.


*In re T.C.* / A169859